## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| SHELDON ROBINSON, | * | |
| JAMES G. "BO" GRITZ | * | |
| | * | |
| Plaintiffs | * | CIVIL NO. 3:02CV432(JCH) |
| | * | |
| vs. | * | |
| | * | |
| CITY OF SUFFIELD, | * | |
| MARK LEAHY, Chief of Police, in his | * | |
| Official and individual capacity and | * | |
| Successor to | * | |
| ROBERT WILLIAMS, Chief of Police, in | * | |
| his official capacity AND, | * | |
| DAVID REESE, Suffield Police Officer, in | * | |
| his official and individual capacity | * | |
| | * | |
| Defendants | * | OCTOBER 8, 2003 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.    BACKGROUND

Pursuant to 42 U.S.C. § 1983, the plaintiff Sheldon Robinson[1] brought the instant

lawsuit by way of a March 8, 2002 Complaint, claiming therein that his arrest in October of 1998

for, *inter alia*, attempted kidnapping in the first degree in violation of General Statutes § 53a-92,

53a-49 and 53a-8, was unlawful. See, *Plaintiff's Complaint dated March 8, 2002*, attached

hereto and marked as **Exhibit A**. The plaintiff's claims stem from his 1998 arrest in Texas

---

[1] Mr. James G. "Bo" Gritz is no longer a party to this lawsuit. Under the terms of this court's ruling, Mr. Gritz was ordered to attend a deposition within 45-days from the granting of defendant's conditional motion to dismiss with prejudice. (Doc. # 15). The depositions of Mr. Gritz and Mr. Robinson were duly noticed for July 10, 2003. Although Mr. Robinson was deposed on that day, Mr. Gritz did not appear. Thereafter, the defendant filed a motion to dismiss with prejudice, which was granted by the court by way

pursuant to a twenty-one (21) page arrest warrant application signed by the Honorable Wendy

Susco, judge of the Connecticut Superior Court, on September 11, 1998.[2]  *See, Application for*

*Arrest Warrant dated August 18, 1998, as signed and dated by Judge Wendy Susco on*

*September 11, 1998*, attached hereto and marked as **Exhibit B**; *see also*, *Affidavit of David*

*Reese*, attached hereto and marked as **Exhibit C**.  The essential allegation contained in the

plaintiff's complaint, and confirmed by way of the plaintiff's deposition testimony, is that Officer

David Reese "intentionally, fraudulently and negligently" included material misrepresentations

and/or omissions within arrest warrant application "in an effort to secure judicial approval."

**Exhibit A**, pp. 7-9, ¶¶ 20-24.    The plaintiff was acquitted by a jury on all charges on March 8,

2000; **Exhibit A**, pg. 10, ¶ 30; and now claims that the arrest warrant application at issue

contained false statements and/or material omissions that were necessary to the original finding

of probable cause, thus necessitating a hearing under *Franks v. Delaware*, 438 U.S. 154, 155-

56 (1978). see also, *Velardi v. Walsh*, 40 F.3d 569, 573 (2d. Cir. 1994); *Bourguignon v. Guinta*,

247 F.Supp.2d 189 (D. Conn. 2003).

---

of an endorsement order on or about August 21, 2003.  (Doc. #16).   Accordingly, Sheldon Robinson is the
sole remaining plaintiff in this lawsuit.
[2] The plaintiff was arrested on the following charges: (1) conspiracy to commit kidnapping in the first
degree in violation of General Statutes §53a-92 and §53a-48; (2) conspiracy to commit custodial
interference in the first degree in violation of General Statutes §53a-97 and §53a-48; (3) criminal attempt
to commit kidnapping in the first degree in violation of General Statutes §53a-49 and §53a-8; and (4)
criminal intent to commit custodial interference in the first degree in violation of §53a-97, §53a-49 and
§53a-8.

A.    **Background[3] on the Arrest of the Former Plaintiff Mr. James "Bo" Gritz on September 30, 1996**

As set forth in the defendants' Local Rule 9(c)1 Statement, the plaintiff's arrest came after an extensive investigation by the Suffield Police Department following the arrest of Mr. James G. "Bo" Gritz[4] on September 30, 1996.   See, _Defendants' Local Rule 9(c)1 Statement_, attached hereto marked as **Exhibit 9.**

On or about September 30, 1996, James G. "Bo" Gritz, was arrested by the defendant, Officer David Reese, in the McAllister Middle School parking lot in Suffield, Connecticut. Mr. Gritz was arrested for, _inter alia_, attempted kidnapping and attempted custodial interference, relating to the attempted kidnapping of Linda Weigand's two minor children, one of whom was enrolled at the McAllister School.   Prior to Mr. Gritz's arrest, the Suffield Police Department had long been aware of an ongoing custody dispute between Thomas Wilkinson and his ex-wife, Linda Weigand, regarding their children, Benjamin Wilkinson and Jonathan Weigand. The Suffield Police Department were also aware of Ms. Weigand's July 3, 1996 arrest for custodial interference in the first degree, whereby she apparently took her children "underground" for more than two years in violation of certain court orders.   Ms. Weigand was arrested in Las Vegas, Nevada in July, 1996, two months before the incident giving rise to the arrest of Mr. Gritz.   During the time she spent living "underground", Ms. Weigand used an assumed name, Donna Maloney.

---

[3] A detailed summary of the facts surrounding the arrest of Mr. Gritz is contained in Judge Rubinow's decision, issued during Mr. Gritz's underlying criminal trial, denying Mr. Gritz's Motion to Suppress certain evidence seized by the police at the time of his arrest in the McAllister School parking lot. _State v. Gritz_, 26 Conn.L.Rptr. 656 (2001), attached hereto and marked as **Exhibit E.**

[4] A 1992 presidential candidate for the Populist Party and highly decorated war veteran, Gritz has been the source of considerable publicity over the years.  A recent search on the "Google" search engine revealed

Based on this background information, the Suffield Police Department was put on notice by various authorities that Benjamin Wilkinson and Jonathan Weigand may be the targets of a possible abduction or kidnapping. **Id**. On September 30, 1996, Officer David Reese went to the McAllister Middle School based on a report of a suspicious vehicle, at which time he observed a blue automobile with a Nevada license plate, 653HCJ. The operator of the vehicle, James R. Gritz, indicated that he was looking for a 1957 Chevrolet to purchase. **Id**., at pg. 2.

When asked who the owner of the 1957 Chevrolet vehicle was, neither Mr. Gritz nor his son could provide any information regarding the alleged seller. **Id**. pg. 2-3.   Thereafter, James R. Gritz and James G. "Bo" Gritz were requested to step out of the vehicle. James Gritz had a folding knife in his possession. Officer Reese also found a full set of lock picking tools, two sixteen channel radios, and a multi-screw driver tool-type set. Officer Reese also found AA battery-powered mini-flashlight as well as a prescription medicine bottle with the name "Linda Weigand" on it. **Id**. pg. 3.

Officer Reese also examined the passenger's compartment and found series of papers related to the McAllister Middle School, including the schedule for academic days, the lunch schedules, etc.   Officer Reese also found a large cardboard box containing 10 pounds of papers which appeared to be legal documents associated with the custody battle between Linda Weigand and Thomas Wilkinson. On the top of this box was a paper that contained a color photograph of both boys, Jonathan Weigand and Benjamin Wilkinson. **Id**. pp. 4-5.

Officer Reese also found documentation showing Linda Weigand's address as 10 Burbank Road, Stafford Springs, Connecticut 06875-0131, which was later determined to be

---

approximately 4450 web sites referencing Mr. Gritz, many of which note the arrests of Mr. Gritz and Mr.

the address Linda Weigand used during the charges pending against her in the superior court. **Id**. pg. 5.  A subsequent investigation revealed that Mr. Gritz was driving a 1995 Mitsubishi Mirage registered in the name of Donna Maloney, an alias used by Linda Weigand while she lived underground in Las Vegas, Nevada. During the course of the conversation with James G. "Bo" Gritz, Officer Reese learned that he had met Linda Weigand earlier in the day at a Budgetel Inn. He had last seen Ms. Weigand in a Friendly's Restaurant. In addition, the two 16-channel radios found in Linda Weigand's car, were later traced to Gritz's "Center for Action", which had apparently rented a set of radios.  These radios were shipped in care of Scott Weekly at High Adventure Sports in Chattanooga, Tennessee.  All of the radios had been returned except four 16-channel radios, four spare batteries and one single unit rapid charger. **Id**. at pg. 6.

Mr. Gritz was thereafter arrested for criminal attempt to commit kidnapping in the first degree, and criminal attempt to commit custodial interference. **Id**. pp. 6-7.

### B.    Investigation and Subsequent Arrest of Mr. Robinson

Further investigation by Officer Reese and the Suffield Police Department revealed the following connections between Mr. Gritz and the plaintiff Sheldon Robinson: that at the time of his arrest James "Bo" Gritz had hotel room keys no. 408 and 410 at the Budgetel Inn on Ella Grasso Turnpike in Windsor Locks, which was located near Bradley International Airport. These rooms were registered in the name of Sheldon Robinson and were charged to an American Express Account. **Arrest Warrant Application**, pg. 7, **Exhibit B.**

---

Robinson at issue in this case.

During the days just prior to September 30, 1996, it was discovered that Sheldon Robinson had been to the McAllister Middle School and represented to employees at the Guidance Office that he expected to receive a job promotion and be transferred to the area.[5] School employees, Kim Moriarty and Tracy Scatolini, identified Sheldon Robinson from an array of photographs as the person being at the school and requesting the various material. Ms. Moriarty and Ms. Scatolini gave Mr. Robinson a series of paperwork, including the school schedule. At this time, Mr. Robinson did not have any known children to be in the McKinney School District in McKinney, Texas. Id. pp. 9-10.

The investigation further revealed that Sheldon Robinson was in the area between September 24, 1996 and October 1, 1996, using a 1976 Elanka Viking Model 17-31A, a fixed wing single engine airplane, under serial #76-32-164, made of wood and canvas construction. Id. at pg. 10. Mr. Robinson rented a white 1996 Pontiac Grand Prix from Avis Car Rental, using his State of Texas driver's license. Id. at pg. 10.  Mr. Robinson rented two rooms at the Motel 6 on September 24, 1996, and that on September 25, 1996, a woman by the name of Donna Maloney checked into Motel 6. Donna Maloney is the alias used by Linda Weigand during her time "underground" with Jonathan Weigand and Benjamin Wilkinson. Id. at pg. 11.

On September 26, 1996, Mr. Robinson rented a tan Nissan, which was driven a total of 702 miles.    Mr. Robinson flew his airplane to Skylark Airport, where he stayed between September 27 and September 29, 1996. A subsequent investigation revealed that Sheldon

---

[5] During his deposition, Mr. Robinson stated that he had never been north of Virginia prior to flying his plane with Mr. Gritz as a passenger to Connecticut a week before Mr. Gritz's arrest. **Exhibit D**, pg. 45.  In addition, Mr. Robinson testified that it was just coincidence that he had previously visited the school where one of Mrs. Weigand's children attended and where Mr. Gritz was arrested days later. **Exhibit D**, pg. 71-73.

Robinson paid for a bill of food and beverage at Friendly's Restaurant on September 28, 1996.

As noted, Mr. James "Bo" Gritz mentioned that he had met Ms. Weigand at a Friendly's

Restaurant. **Id.** at pg. 12. The history of the connection between James R. "Bo" Gritz and Linda

Weigand[6] is well documented, particularly his vocal support of her during his radio program.

**Id.**, at pp. 17-21.

      **C.**    **Alleged Material Misrepresentations in the arrest warrant application**

The alleged material misrepresentations in the arrest warrant application include the

following: (1) that the plaintiff was flying a plane constructed of wood and canvas in an effort to

avoid radar from Texas to Connecticut; (2) that the plaintiff had no reason to be at the

McAllister School in Suffield because he had "no known children"[7]; (3) that the plaintiff flew his

plane to AMR Combs at Bradley Field on September 30, 1996, just prior to the attempted

kidnapping so that the plane could be more available for a getaway; (4) that one of the minor

children was walking near Mr. Gritz's car at the time of his arrest; and (5) that the plaintiff's

plane was included on a list obtained by the defendants as having been at AMR Combs at

Bradley Field on September 30, 1996.[8]

      **D.**    **Alleged Material Omissions**

---

[6] The State of Connecticut considers Ms. Weigand a fugitive as a result of her failure to appear for her criminal case involving the underlying custodial interference charge following her arrest in Las Vegas in 1996.

[7] The arrest warrant application actually states, quite accurately, that the plaintiff did not have any "known children enrolled in the McKinney School District" in Texas. **Exhibit B**, pg. 9, Lines 11-12. The plaintiff confirmed during his deposition that he was home schooling his children in 1996. **Exhibit D**, pg. 15, 111 ("Q: So, you were at the [McAllister] school in September of '96, and you had no children enrolled in the McKinney school district in September of 1996? A: That's correct.")

[8] The plaintiff's deposition testimony confirms the discrete nature of his claims at pages 108-117, attached hereto and marked as **Exhibit D**.

The single material omission is alleged to be the following:  that after speaking with the FBI in Dallas during his investigation, Officer Reese learned or should have learned that the plaintiff did, in fact, have children, although those children were not enrolled in the school district because they were being home-schooled. **Exhibit 3**, pg. 136-37.

### E.     Plaintiff's Complaint dated March 2, 2000

#### 1.     Causes of Action Brought Pursuant to 42 U.S.C. § 1983

The plaintiff's Complaint sets forth the following causes of action under 42 U.S.C. § 1983: (1) excessive force, false arrest and substantive due process violations as to **Leahy, Williams and Reese in their individual capacities** (Count One); (2) as against **Williams and Leahy in their individual capacities**[9], the failure to properly train, screen, supervise and/or take appropriate actions to prevent the instant arrest (Count Two); (3) as to the **City of Suffield**, a *Monell*-styled claim (Count Three).

#### 2.     State Law Claims

(1) As to the **City of Suffield**, indemnification pursuant to General Statutes §7-465 (Count Four); (5) as to **Reese**, intentional infliction of emotional distress (Count Five); (6) as to the **Williams and Leahy**, intentional infliction of emotional distress (Counts Six); and (7) as to the **City of Suffield,** respondeat superior (Count Seven).

## II.     LAW AND ARGUMENT

### A.     STANDARD FOR GRANTING SUMMARY JUDGMENT

---

[9] It is assumed that Leahy and Williams are sued in Count Two in the individual capacities in light of the third count against the Town of Suffield, which appears to set forth a *Monell* claim, which would be redundant of a count against Leahy and Williams in their official capacities.  *see*, *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

8

Summary judgment shall enter if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The initial burden is on the moving party to demonstrate the non-existence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Once a motion for summary judgment is properly made, however, the burden then shifts to the non-moving party. Fed. R. Civ. P. 56(e). The non-movant may not rest upon "mere allegations or denial," but "must set forth specific facts showing that there is a genuine issue for trial." Id.

To defeat a properly supported motion for summary judgment, a factual issue must be both "genuine" and "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual issue is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. At 248. A factual issue is not "material" unless it "might affect the outcome of the suit under governing law." Id. The court must draw all reasonable inferences in favor of the nonmoving party. Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have these claims tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims have no factual basis.
>
> Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The evidence thus presented, if otherwise sufficient, is not rebutted by the bald statement that an issue of fact does exist. Kasowitz v. Mutual Construction Co., 154 Conn. 607, 613 (1967), quoting, Boyce v. Merchants Fire Ins. Co., 204 F.Supp. 311, 314 (D. Conn. 1962).

**B.    THE DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE PLAINTIFF'S CLAIM FOR FALSE ARREST BECAUSE THE PLAINTIFF WAS ARRESTED PURSUANT TO AN ARREST WARRANT SIGNED BY A CONNECTICUT SUPERIOR COURT JUDGE BASED ON PROBABLE CAUSE.**

The individual defendant's are entitled to judgment as a matter of law with respect to the plaintiff's claim for false arrest because the arrest warrant application signed by Judge Susco contained probable cause.

A plaintiff who argues that a warrant was issued on less than probable cause faces a "heavy burden"; *Golino v. City of New Haven*, 950 F. 2d 864, 870 (2d Cir. 1991); and must demonstrate that the arresting officers "submitting the probable cause affidavit" acted "with reckless disregard for the truth." *Soares v. State of Conn.*, 8 F.3d 917, 920 (2d Cir. 1993).[10]    In other words, a warrant contains a presumptive level of probable cause unless rebutted by "proof of fraud, perjury or the misrepresentation or falsification of evidence." *Artis v. Liotard*,

---

[10]    By contrast, a claim that a warrantless arrest lacked probable cause involves a different analysis. *Weyant v. Okst*, 101 F. 3d 845, 852 (2nd Cir. 1996). "There can be no federal or civil rights claim for false arrest where the arresting officer had probable cause." *Singer v. Fulton County Sheriff*, 63 F. 3d at 118. "[P]robable cause...signifies not that [a] particular officer believed that the person who was arrested had committed a crime, but that a reasonable officer would have believed that the person had committed a crime." *Mahoney v. Carrs*, 976 F. 2d 1054, 1057 (7th Cir. 1992). In order to determine whether probable cause existed for an arrest, the court must consider the facts available to the officer at the time of the arrest. *Ricciuti v. N.Y.C. Transit Authority*, 124 F. 3d 123, 128 (2nd Cir. 1997). In making such a determination, courts must employ an objective standard and should not consider the subjective beliefs of the arresting officers. *Buck v. Carey*, 706 F. Supp. 158, 162 (D. Conn. 1988). "Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution and the belief that an offense has been committed by the person to be arrested." *Singer v. Fulton County Sheriff*, 63 F. 3d at 118; *Craig v. Krveminski*, 764 F. Supp. 248 (D. Conn. 1991).   As stated above, where a person is arrested pursuant to a signed warrant, probable cause

934 F.Supp. 101, 103 (S.D.N.Y. 1996). Under state law, the plaintiff, in order to prevail on a claim that he or she was arrested pursuant to a warrant in the absence of probable cause, must show that the officers made the arrest with malice and for an improper purpose. *Lo- Sacco v. Young*, supra, 20 Conn.App. at 20.

Under either scenario, a court "put[s] aside allegedly false information, suppl[ies] any omitted information and determine[s] whether the contents of the corrected affidavit would have supported a finding of probable cause." *Soares,* 8 F.3d at 920.

> Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when the material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)

"Our constitutional preference for warrants reflects a goal of protecting citizens from unjustified police intrusions by interposing a neutral decision maker between the police and the object of the proposed search." *State v. Miller*, 227 Conn. 363, 382 (1993). In determining whether a warrant is supported by probable cause, courts pay great deference to the issuing magistrate's determination of probable cause and recognize that such a finding should not be set aside unless arbitrarily exercised.

A review of the warrant clearly demonstrates the existence of probable cause even assuming for purposes of this motion the existence of the material misrepresentations and/or

---

is presumed and the plaintiff must prove fraud or intentional misrepresentation of facts in obtaining the warrant, with that fraud or misrepresentation materially altering the probable cause determination.

omissions complained of.[11]    Here, the plaintiff was arrested pursuant to a signed arrest warrant, after a comprehensive investigation, during which time it was discovered that the plaintiff had flown a known confidant of Ms. Wiegand to Connecticut, Mr. James "Bo" Gritz. The Suffield Police Department were long made aware of the fact that Ms. Wiegand had been arrested under an assumed name in Las Vegas for unlawful custodial interference and that there may be a kidnapping of the children in the works.  Mr. Gritz had been a long time supporter of Ms. Wiegand and her attempts to publicize her claim that her children were being sexually abused by their father. When Mr. Gritz was arrested in the parking lot of one of Ms. Weigand's children's schools, Mr. Gritz had in his possession Ms. Weigand's legal documents, prescriptions and information regarding her children's school schedule.

It was later determined that Mr. Gritz had been in the company of the plaintiff in the Windsor Locks area, and had met up with Ms. Weigand in the days before the attempted abduction[12].  In addition, it was discovered that the plaintiff had been at the McAllister School (the situs of Mr. Gritz's arrest) in the days preceding Mr. Gritz's arrest in order to obtain

---

[11] The "misrepresentations" are neither material nor untrue.  For example, the plaintiff claims that defendant Reese stated that his plane was made of wood and canvas so as to avoid radar detection.  In point of fact, the plaintiff's craft, except for the engine, is made predominantly of canvas and wood. **Exhibit D**, pg. 108.  Moreover, the plaintiff's complaint alleges that the warrant incorrectly stated that the plaintiff's plane was at AMR Combs on 9/30/96, just prior to the kidnapping.  However, there is no dispute that during the week prior to Mr. Gritz's arrest the plaintiff's plane was located at both AMR Combs at Bradley International <u>and</u> SkyLark Airport in East Windsor;  Id.,at pg. 113.  Such a discrepancy, even if true, is hardly material in light of the overwhelming evidence implicating Mr. Robinson.  In addition, the plaintiff claims that the warrant stated that one of Ms. Weigand's sons was in the parking lot at the time of the arrest.  The warrant does not contain that information. **Exhibit B**.  Finally, the plaintiff claims that the defendant included in the warrant the fact that the plaintiff had "no known children" when he knew that was false.  In reality, the warrant states that the plaintiff had "no known children enrolled in the McKinney School District" – a perfectly accurate statement even according the plaintiff himself. **Exhibit D**, at pg. 111.

[12] The plaintiff testified during his deposition that he was in the company of Ms. Weigand at the time of Mr. Gritz's arrest and was, in fact, waiting with her for Mr. Gritz to return to the hotel so he could fly him back

information from the school regarding class schedules.[13]    Information of the school's class

schedule was found in Mr. Gritz's vehicle.

Accordingly, the defendants are entitled to judgment as a matter of law on count one of

the plaintiff's complaint alleging false arrest as the warrant signed by the judge of the superior

court contained probable cause, even assuming the truth of the plaintiff's allegations.

### C.    THE INDIVIDUAL OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE EVEN IN THE ABSENCE OF PROBABLE CAUSE, WHICH IS DENIED, THE OFFICERS' ACTIONS WERE OBJECTIVELY REASONABLE.

The individual defendants are entitled to qualified immunity under count one because,

assuming arguendo the absence of probable cause to arrest the plaintiff, which is denied, the

defendants' conduct was reasonable under the circumstances.    In other words, because

reasonable officers could disagree as to the existence of probable cause to arrest the plaintiff,

the defendants are entitled to qualified immunity.

In this regard, a police officer is entitled to qualified immunity in making arrests where

"(1) his conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe

that his actions were lawful at the time of the challenged act." _Cerrone v. Brown_, 246 F.3d 194,

199 (2d Cir. 2001).    With respect to the second prong, a police officer is entitled to qualified

immunity if "officers of reasonable competence could disagree" on whether the probable cause

existed to make an arrest. _Lennon v. Miller_, 666 F.3d 416, 423-24 (2d Cir. 1995).    In other

---

to Texas. **Exhibit D**, pg. 95-97.  While waiting, the two received a phone call from a lawyer indicating
that Mr. Gritz had been arrested and that Mr. Gritz wanted the plaintiff to return to Texas. Id.

words, an officer is not required to pay money damages for an arrest unless "his judgment was so flawed that no reasonable officer would have made a similar choice." Id., at 425. If a reasonable officer in the same position as the arresting officer could reasonably believe probable cause existed under the law then the arresting officer had "arguable probable cause" and is entitled to immunity. _Coons v. Casabella_, 284 F.3d 437, 441 (2d Cir. 2002).

In this regard, the breath of the defense of qualified immunity is such that it protects "all but the plainly incompetent or those who knowingly violate the law." _Malley v. Briggs_, 474 U.S. 335, 341 (1987). Qualified immunity protects officers from damage for false arrest based on reasonable mistakes "because officials should not err always on the side of caution because they fear being sued." _Hunter v. Bryant_, 502 U.S. 224, ___, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991). "[E]ven learned and experienced jurists have had difficulty in defining the rules that govern a determination of probable cause. . . . As he tries to find his way in this thicket, the police officer must not be held to act at his peril." (internal citations omitted) _Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics_, 456 F.2d 1339, 1348 (2d Cir. 1972).

Where an arrest is made pursuant to a warrant signed by a judicial authority, qualified immunity can and should be granted as a matter of course. "In the context of an allegedly unconstitutional arrest, the objective reasonableness standard bars the defense of qualified immunity [o]**nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable.**" _Crone v. Connelly_, 74 Conn.App.

---

[13] Remarkably, the plaintiff testified at his deposition that he later asked Mr. Gritz what he was doing in the parking lot on the day of his arrest. According to the plaintiff, Mr. Gritz stated that he was "'[t]urning around.' That's all he ever said to me." **Exhibit D**, pg. 100, Lines 15-25.

788, 799 (2003), citing *Ham v. Greene*, 248 Conn. 508, 520 (1999), *cert. granted*, *Crone v. Connelly*, 263 Conn. 902 (2003).

Clearly, the warrant was not so lacking as to render "official belief in its existence unreasonable."  Even assuming the absence of probable cause, the officers are entitled to immunity because it was objectively reasonable for them to believe in the existence of probable cause.  "Normally, the issuance of a warrant by a neutral magistrate, which depends of a finding of probable cause, creates a presumption that is was objectively reasonable for the officers to believe that there was probable cause. . . and a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden…. In order to meet such a challenge, the plaintiff must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and the allegedly false statement was necessary for the finding of probable cause." *Golina v. New Haven*, 950 F.2d 864, 879 (2d. Cir. 1991).  Under these circumstances, and assuming the absence of probable cause, reasonably competent police officers would disagree as to whether probable cause existed, and therefore qualified immunity shields the individual defendants from suit. *Martinez v. Simonetti*, 202 F.3d 625, 634, (2d. Cir. 2000); *Robison*, supra, 821 F.2d at 921 (2d. Cir. 1987).

Moreover, even assuming the plaintiff claims fraud or misrepresentation in the procurement of the warrant, the officers would be entitled to qualified immunity under the aforementioned *Franks* analysis.

> Under that test, factual disputes are extraneous to the resolution of the issue of qualified immunity if the affidavit accompanying the warrant is sufficient, after correcting for material misstatements or omissions, to support a reasonable officer's belief that probable cause existed.. … In this regard, the materiality of a

> misrepresentation or an omission is a mixed question of law and fact. .. The weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is **inappropriate in doubtful cases**. . . Nonetheless, if the evidence, viewed in the light most favorable to the [plaintiff], discloses no genuine dispute that a magistrate would have issued the warrant on the basis of the corrected affidavits, the under the ordinary standard for summary judgment . . . a qualified immunity defense must be upheld.

*Crone v. Connelly*, 74 Conn.App. 788, 799 (2003), citing *Ham v. Greene*, 248

Conn. 508, 520 (1999), *cert. granted*, 263 Conn. 902 (2003).

The warrant application at issue contains ample probable cause even assuming some

claim of fraud or misrepresentation. This is not a "doubtful case" whereby summary judgment

would be inappropriate. The twenty-one page warrant is remarkable in the detail in which it

connects the activities of Mr. Robinson and Mr. Gritz during the week preceding the arrest of

Mr. Gritz. The fact that the plaintiff musters up only five instances of "material

misrepresentations" – which are neither material nor intentionally untrue - from the 21 page

warrant application speaks volumes to the weakness of his claim. As noted above, the facts in

the warrant are damning and show that Mr. Robinson was at the McAllister School requesting

information on school schedules in the days prior to the arrest of Mr. Gritz in the same school's

parking lot. The warrant also demonstrates that at the time of his arrest, Mr. Gritz was in

possession of McAllister school information and pictures of Ms. Weigand's boys, and was

driving Ms. Weigand's vehicle, with no known reason to be at the school. That Mr. Robinson

was in the presence of Ms. Weigand on the day of Mr. Gritz's arrest, and further was staying

with Mr. Gritz in the same hotel with access to a plane, establishes the probable cause found by

Judge Susco. This is particularly true in light of the background information the Suffield Police

had regarding a possible abduction of the children following the arrest of their mother in Las Vegas.

Accordingly, the defendants are entitled to qualified immunity.

### D.     THE PLAINTIFF'S CLAIM FOR EXCESSIVE FORCE UNDER COUNT ONE IS FACTUALLY AND LEGALLY INSUFFICIENT.

The plaintiff's complaint appears to assert a claim for excessive force in violation of the Fourth Amendment to the United States Constitution.   This claim is based entirely on his detention in Texas and, more specifically, his transportation back to the State of Connecticut. In his complaint, the plaintiff alleges that in October, 1996, he was "transported by van for six days, handcuffed, shackled and belly-chained to Connecticut to stand trial" for various felonies including attempted kidnapping. **Exhibit A**, ¶ 28.  Even assuming the truth of these allegations, they do not amount to excessive force and, even if they did, such alleged conduct is not ascribed to the defendants in this case.

As is apparent, the plaintiff does not claim that the individual defendants engaged in excessive force.  Rather, the claim appears to be that authorities in Texas, who transported him to Connecticut, engaged in certain conduct.   Regardless of whether it was Texas authorities or Connecticut authorities, the plaintiff does not charge any of the defendants in this case with using excessive force, thus entitling them, as a matter of fact and law, to judgment in their favor.

Although police officers may have an affirmative duty to intervene to protect the constitutional rights of citizens in their presence; *O'Neill v. Krzeminski*, 830 F.2d 9, 11 (2d Cir. 1988); an officer who fails to intercede is liable for preventable harm caused by others only if:

"(1) excessive force is being used; (2) a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement officer.   *Anderson v. Branen*, 17 F.3d 552 (1994)."   Under such circumstances, an officer still must have a reasonable opportunity to intervene so as to prevent a constitutional violation.  Id.

It can not be reasonably argued that the individual defendants had a realistic opportunity to intervene, as they were not involved in the transport of the plaintiff to Connecticut.

**E.    EVEN ASSUMING THE TRUTH OF THE PLAINTIFF'S ALLEGATIONS, SUCH CONDUCT IS NOT CONSCIENCE SHOCKING SO AS TO SUPPORT A SUBSTANTIVE DUE PROCESS CLAIM, NOR DOES IT IMPLICATE A RIGHT COVERED BY THE DUE PROCESS CLAUSE.**

The plaintiff alleges in count one a violation of the Fifth Amendment.   The Fifth Amendment to the United States Constitution states that no person shall be "deprived of life, liberty, or property, without due process of law".     The Due Process Clause of the Fifth Amendment has been held to protect individuals against two types of government action. "Substantive Due Process" prohibits the government from engaging in conduct that "shocks the conscience" of the court; *Rochin v. California*, 342 U.S. 165, 172 (1952); or interferes with rights "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 3225-26 (1937).

With regard to due process clause, however, the United States Supreme Court has held that "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *County of Sacramento v. Lewis*, 523 U.S.  833,  842, 118 S.Ct. 1708 (1998); *Lauro v. Charles*, 219 F.3d 202, 208 (2d Cir. 2000).    Here, the plaintiff seeks the protections afforded by the

18

Fourth Amendment, thus negating any claim under the more "generalized notion of substantive due process."

Morever, the plaintiff cannot claim that he has suffered the loss of a right "implicit in the concept of ordered liberty. The Due Process Clause of the Fourteenth Amendment states that no state shall "deprive any person of life, liberty, or property, without due process of law." Although the concept of substantive due process is necessarily imprecise and has been characterized as a "rational continuum"; Poe v. Ullman, 367 U.S. at 543 (opinion dissenting from dismissal on jurisdictional grounds); the [Supreme] Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decision-making in this unchartered area are scarce and open-ended." Collins v. City of Harker Heights, 503 U.S. _____, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." Albright v. Oliver, ____ U.S. ____, 114 S.Ct. 807, 127 L.Ed. 2d 114 (1994); see, Loving v. Virginia, 388 U.S. 1 (1967) (relating to marriage); Griswold v. Connecticut, 381 U.S. 479 (1965) (the use of contraception); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535 (1942 ) (procreation rights).

No such claim can or is being made in this case beyond bald assertions, thus entitling the defendants to judgment as a matter of law.

**F.    THE DEFENDANTS WILLIAMS AND LEAHY ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW WITH RESPECT TO COUNT TWO'S SUPERVISORY LIABILITY CLAIM.**

In Count Two, the plaintiff appears to allege a supervisory liability claim against the former and current Police Chiefs for the Town of Suffield, defendants Williams and Leahy. As with a local government defendant, a supervisor cannot be held liable under §1983 on a respondeat superior basis. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 n.58 (1978). Supervisory liability may be imposed when an official's actions amount to a deliberate indifference to constitutional rights of others. *Merriweather v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989). However, a supervisor may be held liable for the actions of a subordinate if there is an "affirmative causal link" between the action or inactions of the supervisor and the plaintiff's injuries. *Rizzo v. Goode*, 423 U.S. 362, 371 (1976); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001). More than one incident is typically required to impose supervisory liability, and usually requires knowledge by the supervisor that a subordinate was prone to commit unconstitutional behavior so as to amount to actual or constructive notice. *Poe v. Leonard*, 282 F.3d 123, 136 (2d Cir. 2002); *Merriweather v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989).

Here, the plaintiff's complaint alleges that defendants Williams and Leahy failed to properly train, hire, supervise and/or investigate subordinates so as to prevent the alleged constitutional violations. Boilerplate allegations can not and do not support the appropriately high burden of proof at issue, namely that defendants Williams and Leahy were deliberately indifferent to the constitutional rights of the plaintiff. In addition, the plaintiff does not allege and can not prove that the defendants were allegedly involved in more than one incident like the one complained of here in order to sustain a supervisory liability claim. Finally, the plaintiff can not prove an "affirmative causal link" between Williams and Leahy and the plaintiff's alleged

constitutional violation.  Accordingly the defendants Williams and Leahy are entitled to judgment as a matter of law on Count Two of the plaintiff's complaint.

### G.    THE PLAINTIFF DOES NOT SUFFICIENTLY ALLEGE AND CANNOT PROVE A _MONELL_ CLAIM AGAINST THE TOWN OF SUFFIELD UNDER COUNT THREE.

The defendant Town of Suffield is entitled to judgment as a matter of law with respect to the plaintiff's claim under count three because the plaintiff does not sufficiently allege and can not prove municipal liability under _Monell v. New York City Dept. of Social Servs._, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

A municipality may not be held liable under a theory of respondeat superior.  Id., at 694.  A municipality may be held responsible for constitutional violations only where the entity is a "moving force" behind the deprivation.  _Polk County v. Dodson_, 454 U.S. 312, 326 (1981).   The plaintiff must plead and prove that an official policy or custom of the Town caused the plaintiff to be subjected to the denial of a constitutional right.  _Zahra v. Town of Southhold_, 48 F.3d 674, 685 (2d Cir. 1995).  In other words, a municipality cannot properly be held liable in such an action unless the "injury was inflicted by its 'lawmakers or by those who edicts or acts may fairly be said to represent the official policy.'"  _St Louis v. Praprotnik_, 485 U.S. 112, 121-22 (1988), quoting _Monell_.    Absent a claim that the municipality had a policy and that policy caused a constitutional violation, the plaintiff can not prevail.  _Vippolis v. Village of Haverstraw_, 768 F.2d 40 (2d Cir. 1985).

Here, the plaintiff does not allege a _Monell_ claim insofar as he does not allege that the failure to hire or train was the cause in fact and/or legal cause of the plaintiff's injuries.  _Owens v. Haas_, 601 F.2d 1242 (2d Cir. 1979).   In addition, the plaintiff does not allege any causal

nexus between the actions of the individual officers and a policy or custom of the Town of Monroe. In the absence of a claim or allegation that the municipality was a moving force behind the violation by way of an official policy or custom that caused a constitutional violation, the claim against the Town of Monroe must fail.

Finally, and most notably, the plaintiff does not allege and can not now prove that the failure to train amounted to "deliberate indifference" to constitutional rights where the policymaker: (1) knows to 'a moral certainty' that his employees will confront a given situation; (2) the situation presents a municipal employee with a difficult choice which proper training will make less difficult; and (3) employee's wrong choice will frequently cause constitutional violations. _Walker v. City of New York_, 974 F.2d 293, 297 (2d Cir. 1992); _Keeney v. City of New London_, 196 F.Supp.2d 190, 200-01.

In the absence of any proof regarding the above three requirements, the plaintiff's claim against the officers in their official capacity are insufficient and entitle the defendants to judgment as a matter of law.

### H.    THE DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS THE DEFENDANTS CONDUCT WAS NOT EXTREME AND OUTRAGEOUS

"In order for a plaintiff to prevail in a case for liability under [intentional[14] infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor

---

[14] The defendants are likewise entitled to judgment as a matter of law with respect to the plaintiff's claim for negligent infliction of emotional distress on the grounds of governmental immunity. Although municipal employees are personally liable for their own tortious conduct; _Purzycki v. Fairfield_, 244 Conn. 101, 107 (1998); the doctrine of governmental immunity protects municipal employees from liability arising from performance of governmental acts that are discretionary in nature. _Gauvin v. New Haven_, 187 Conn. 180, 184 (1982). The decision to police the community and those involving the investigation

intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's emotional distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Peyton v. Ellis*, 200 Conn. 243, 253, 510 A. 2d 1337 (1986) (*quoting* *Murray v. Bridgeport Hospital*, 40 Conn.Sup. 305 (1973)). Whether a defendant's conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question for the court to determine as a matter of law. Restatement (Second) of Torts, §46 comment (h); *Mellaly v. Eastman Kodak Co.*, 42 Conn. Sup. 17, 18, 597 A. 2d 846 (1991); *Reed v. Signode Corporation*; 652 F. Sup. 129, 137 (D. Conn. 1986). The issue becomes a jury question only if reasonable minds could differ as to whether such conduct was extreme or outrageous. *Mellaly v. Eastman Kodak Co.*, 42 Conn. Supp. at 18; *see also*, Kinter v. Nidec-Torin Corp., 662 F. Sup. 112, 114 (D. Conn. 1987) (applying Connecticut law); *but see*, *Murray v. Bridgeport Hospital*, 40 Conn.Sup. 56, 62 (1984).

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'". Mellaly v. Eastman Kodak Co., 42 Conn. Supp. 17, 20, 597 A.2d 846 (1991), *quoting*, 1 Restatement (Second), Torts, § 46, comment (d). "…The plaintiff must allege and prove conduct considerably more egregious than that experienced in the rough and tumble of everyday life…." *Whelan v.*

---

and arrest of those that break the law has been held to be a governmental act requiring the exercise of

*Whelan*, 41 Conn. Sup. 519, 522, 588 A.2d 251 (1991).  For conduct to be considered extreme and outrageous, it must exceed "all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." (Internal quotations and citations omitted.) *DeLaurentis v. New Haven*, 220 Conn. 225, 267 (1991); Prosser & Keeton, Torts (5th Ed.) § 12, at 60 (1984).

Even if true, the plaintiff's allegations do not meet this appropriately high threshold. First, if this court finds the existence of probable cause under the warrant, it is respectfully submitted that the plaintiff can not prove, as a matter of law, extreme and outrageous conduct. The same would hold true should this court find that the defendants' conduct was objectively reasonable and therefore entitle the defendants to qualified immunity.  Finally, the defendants alleged conduct, even assumed as true for purposes of this motion for summary judgment, represents nothing more than a police officer conducting an investigation and filling out an arrest warrant which, contrary to the plaintiff's subjective belief, contained materially accurate facts to the best of the officer's knowledge.  The plaintiff testified during his deposition that he did not have any personal knowledge that the defendant Reese knowingly and intentionally provided untrue information.  **Exhibit D**, pg. 106-116.   His claim is that certain information turned out to be inaccurate.   Even if true, such conduct does not amount to extreme and outrageous conduct.

Such conduct certainly can not be characterized as exceeding "all bounds usually tolerated by decent society." *DeLaurentis v. New Haven*, 220 Conn. at 267, *quoting Peytan v.*

---

discretion.  *Gordon v. Bridgeport Housing Authority*, 208 Conn. 161, 180-81 (1988); *Castorina v. Stewart*, 22 Conn. L. Rptr. 1 (1998).

*Ellis*, 200 Conn. at 254 n.5.   Accordingly, the defendants are entitled to judgment as a matter of law on the claim for Intentional Infliction of Emotional Distress.

**I.    THE PLAINTIFF'S DERIVATIVE CLAIM UNDER GENERAL STATUTES § 7-465 AGAINST THE TOWN OF SUFFIELD DOES NOT SURVIVE SUMMARY JUDGMENT IF THE CLAIMS AGAINST THE INDIVIDUAL OFFICERS FAIL AND BECAUSE THE PLAINTIFF DID NOT PROVIDE THE TOWN WITH NOTICE UNDER § 7-465.**

In counts four of the plaintiff's complaint, the plaintiff alleges that the Town of Suffield is derivatively liable for the actions of its employees under General Statutes § 7-465.   The plaintiff fails to set forth any independent basis of liability against the town.   To the extent that the individual defendants are successfully with respect to this Motion for Summary Judgment, the Town's liability would be extinguished, as it is derivative of the individual employee's liability. *Kaye v. Manchester*, 20 Conn.App. 439, 443-44 (1990).

Moreover, the plaintiff did not provide adequate notice to the Town of Suffield within six (6) months of the occurrence complained of in the complaint.   General Statutes § 7-465; *Affidavit of Attorney Ed McAnaney*, attached hereto and marked as **Exhibit F.**

**J.    THE TOWN OF SUFFIELD IS ENTITLED TO JUDGMENT AS A MATTER OF LAW WITH RESPECT TO COUNT SEVEN AS THE TOWN CAN NOT BE HELD LIABLE UNDER 42 U.S.C. § 1983 ON THE BASIS OF RESPONDEAT SUPERIOR.**

The Town of Suffield can not be found liable under 42 U.S.C. § 1983 based on the doctrine of respondeat superior.   *Monell v. Dept of Social Services*, 436 U.S. 658, 691-92 (1978).

THE DEFENDANTS

BY: _____
        MICHAEL C. DEAKIN
        Law Offices of Peter D. Clark
        525 Bridgeport Avenue
        Shelton, CT  06484
        Telephone:  203/925-9688
        Federal Bar No: ct06814

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, on the date hereon to:

Wendi Doolittle Kowarik, Esq.
P.O. Box 820
Derby, CT  06418

Edward G. McAnaney, Esquire
McAnaney & McAnaney
Suffield Village
Suffield, CT 06078

_____
MICHAEL C. DEAKIN